## Lyskooka's Adoption

*Matthews & Matheny*, for petitioners.

*Joseph Solomon* and *Charles H. Dlugokenski*, for respondents.

BRAHAM, P. J., September 27, 1945.—The petition of James L. Stone and Aileen W. Stone, his wife, for permission to adopt a baby named Georgia Lee Lyskooka is resisted by Sophia Lyskooka, the natural mother of the child, and by Stella Lyskooka, mother, and by Helen Zilinski, a sister of Sophia Lyskooka. The petition for adoption alleged a consent by the mother but the only consent attached to the petition

was a consent to J. M. Dunlap, juvenile court officer, to place the child out for adoption. At trial the petition was amended to allege abandonment on the part of the mother and on this issue the case was tried. Three separate hearings were held. From the evidence taken we make the following

*Findings of fact*

1. The female child known as Georgia Lee Lyskooka was born in the New Castle Hospital, New Castle, Pa., on November 27, 1944. She was born out of lawful wedlock. Her mother was Sophia Lyskooka; her paternity was never acknowledged.

2. Sophia Lyskooka was born on March 3, 1925. Her parents are Adam and Stella Lyskooka, who live at 1505½ Jefferson Street, New Castle, Pa. Helen Zilinski, who is intermarried with William Zilinski, is a sister of Sophia. They live near New Castle. Stella Lyskooka is another sister of Sophia. She is not married. Another sister named Jennie is married and lives near New Castle.

3. The cost of the doctor's care and hospital attention necessary at the time of the birth of the child was borne by the sister, Stella Lyskooka.

4. At and prior to the time of the birth of her baby, Sophia Lyskooka lived with her sister, Stella, at the home of Mike Russo, in New Castle, Pa. Thither she returned after leaving the hospital and there she lived except for a few days at the home of her sister, Jennie and one day at the home of her sister, Helen, until about May 1945.

5. After the birth of the child and prior to December 28, 1944, the child was kept with her mother. On this date the child was placed in the care of Mrs. Cecil Mae Kemp where she remained until April 7, 1945. The cost of her maintenance was paid by Stella Lyskooka, Sophia's sister. During this period Sophia expressed

the desire to have the baby adopted. She went to see the child only when Mrs. Kemp sent for her and demanded money for the child's keep. During the last seven weeks the child's mother did not come to see her at all. Sophia was out of town much of the time.

6. From April 7, 1945, to about May 30, 1945, the child was kept at the home of her maternal grandparents, Adam and Stella Lyskooka. Her mother lived there only intermittently during this period. Much of the time she was out of town.

7. On May 21, 1945, Sophia Lyskooka went to J. M. Dunlap, Juvenile Court and Probation Officer for the Courts of Lawrence County, to request that he secure a home for the child with a view to adoption, representing that she was unable to care for the child and had no home for her. On May 22, 1945, she returned and signed a general consent to adoption, expressly stating that it was to constitute an abandonment of the child and authorizing Mr. Dunlap to find her a home. This consent was sworn to before the clerk of the orphans' court. It appears attached to the petition. During the next few days she frequently called Mr. Dunlap and asked him why he did not come and get the child.

8. Mr. Dunlap consulted James L. Stone and Aileen W. Stone, petitioners, and learned that they were desirous of having the child for adoption. Thereupon, Mr. Dunlap went to the home of Adam and Stella Lyskooka, asked for Sophia, learned she was out of town and believed to be in California, acquainted the grandmother with the fact that certain persons wanted the baby for adoption and told the grandmother that a lady would call for the child that afternoon. The grandmother understood the purpose of his visit. That afternoon Marilyn Pierce Jones got the child and on May 29 or 30, 1945, she was delivered into the custody of Mr. and Mrs. Stone.

9. Petitioners gave the child a thorough medical examination and took her into their home. Thereafter they gave the child complete maintenance and care, without any proffered aid by, or any interference from, the natural mother of the child or any of her family. They are worthy people, well able financially and well qualified in every way to give the child an excellent home. They have become very much attached to the child.

10. About June 3, 1945, Helen Zilinski and William Zilinski came to see J. M. Dunlap to remonstrate about the giving of the child for adoption and to say they wanted the child. Nothing further was done until after the petition for adoption was filed June 25, 1945. At that time her family knew nothing of the whereabouts of Sophia Lyskooka and were forced to advertise in the daily newspaper to get in contact with her. After turning the child over to Mr. Dunlap and before the time of hearing, Sophia Lyskooka and her sister Stella had been travelling about the country with no employment and no visible means of support. They had been in Virginia, Indiana and other States.

11. At the hearing Sophia, her mother, her sister, Helen Zilinski, and her brother-in-law, William Zilinski, appeared and contested the adoption. No further petition for adoption was ever presented.

12. It has been shown to our satisfaction that Sophia Lyskooka abandoned her child when she delivered her to J. M. Dunlap. It was her intention to abandon the child and all her conduct until the time of hearing was consistent with this intention.

13. Sophia Lyskooka is not a fit and proper person to have the custody of her child.

14. The welfare of the child will be best subserved by allowing her adoption by James L. and Aileen W. Stone.

## Discussion

Adoption is the creature of statute; it was unknown at common law: Thompson's Adoption, 290 Pa. 586. The present statute is the Act of April 4, 1925, P. L. 127, as last amended by the Act of June 5, 1941, P. L. 93 and the Act of July 2, 1941, P. L. 229, 1 PS §1 et seq. Section 1 of the Act of 1941, P. L. 229, 1 PS §2, lists the consents necessary to adoption, the applicable section being: "Consent to the adoption is necessary as follows:

"(c) Of the parents or surviving parent of the person proposed to be adopted, if such person shall not have reached the age of eighteen years, except that, in the case of an illegitimate child, the consent of the mother only is necessary, unless the father has acknowledged such child, but the consent of a parent who has been adjudged a lunatic or habitual drunkard, or who has abandoned the child, is unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact."

Georgia Lee Lyskooka was born out of lawful wedlock and her paternity was never acknowledged. The purported consent of her mother, which is attached to the petition is not a lawful consent and cannot operate as such because it does not consent to an adoption by any specific person: Keeler's Adoption, 52 Pa. Superior Ct. 516; Andrews' Adoption, 14 D. & C. 343, 351. Nevertheless, the consent to an adoption by any person to be selected may operate under the law as an abandonment of the child: Hazuka's Case, 345 Pa. 432, 435; McCann's Adoption, 104 Pa. Superior Ct. 196.

This is one of the two prinicipal questions of fact for decision in the case. Has Sophia Lyskooka abandoned her child Georgia? In Hazuka's Case, supra, at 435, Mr. Justice Stern has this to say:

"Abandonment may occur in a number of ways. It may be effected by a formal legal instrument or merely by conduct evincing a settled purpose to forego all parental duties and relinquish all parental claims. It is a matter largely of intention to be ascertained from the circumstances, and whether or not a child has been abandoned is a question of fact."

In Weinbach's Appeal, 316 Pa. 333, Mr. Justice Schaffer, speaking of a general consent such as we have in this case said (p. 337) :

"In the paper which she signed appellant gave up her rights to the child and authorized its adoption, agreeing to sign the necessary consent thereto. On the day she executed the paper she abandoned the infant to those who received it for adoption. She has never provided for it and made no claim for it for four months after she gave it up."

But the evidence of abandonment of her baby by Sophia Lyskooka is not limited to this paper. It was she who sought adoption for her child. She kept after Mr. Dunlap until the paper was signed. Then she disappeared. When Mr. Dunlap went to get the child the grandmother said Sophia had been gone since Decoration Day and when Mr. and Mrs. Zilinski came to see Mr. Dunlap they expressed the belief that Sophia was on her way to California. Apparently none of her family knew her whereabouts until just before the time for hearing on July 6, 1945, because there is in evidence proof of an advertisement in the New Castle News under dates of June 30, July 2 and July 3, 1945, asking Sophia Lyskooka to get in touch with her sister Helen or Mr. Solomon, her attorney. So far as Sophia is concerned the baby might have died from starvation and neglect during this period. Even before leaving the child with Mr. Dunlap, Sophia had not been faithful to her. She did not go to see the child except when Mrs. Kemp sent for her, failed to visit her at all for

weeks on end and allowed her sister Stella to pay for the child's keep, although she was herself a wage earner. It is a clear case of abandonment.

The public policy giving parents natural guardianship of their children is based upon deep and compelling principles of human nature. Family government is the oldest form of government in the world and still, within its sphere, the best; because in the long run parents may be depended upon to look after their own through success and adversity as no one else will. But once parents have deliberately failed to perform the duties of parenthood and have abandoned a child to the mercies of the world, the State withdraws the right to control. The welfare of a child is no primary reason for adoption. The law does not tolerate the idea that, because the worldly state of a child may apparently be bettered, its adoption by more well to do or more cultured parents may be permitted. "It is ill to loose the bands which God decrees to bind." But once abandonment be established, the welfare of the child moves from a secondary to a primary place: Com. ex rel. Piper v. Edberg et ux., 346 Pa. 512, 517.

This leads us to a consideration of the second principal question for decision, namely, will the welfare of Georgia Lee Lyskooka be promoted by this adoption? The decision is an easy one and yet one of great difficulty. Tested by all practical standards, it is clear that the child is much better off with Mr. and Mrs. Stone. There she is not an unwanted but a wanted child. They are able to give her all the advantages of a good home, a good education and genuine affection. On the other hand there are the ties of race and blood.

The child's maternal grandmother while on the stand said that she wants to rear the child; the maternal grandfather did not appear in court. The child's aunt Helen said she and her husband want the child; the husband was in court but did not testify. Yet Sophia

was apparently not welcome at her parents or sisters' home after the birth of the child because the baby was shifted about from one place to another with no one wanting her very much. The sister Jennie kept them about a week; the sister Helen, who now presses her claim, just one day; and the grandmother who had the baby for a few weeks was, according to Mr. Dunlap, quite willing to part with her. It was necessary to hire a stranger to care for the child; Sophia said on the stand that both of her sisters wanted the child but this is not creditable. Why did they not go out and get the child when the grandmother was burdened with her and Sophia was away no one knew where? Not until the child was taken and well placed did they begin to show interest in her.

We have found Sophia to be unfit to rear the child, a necessary inference from the evidence. She was known to the police for fighting on the streets and keeping bad company. She was discharged from her employment because of improper association with men. Curiously enough the most appealing figure in this drama is the sister Stella who never appeared in court. She it was who really stood by Sophia, paying for the lying-in expenses and the support of the child when no one else appeared able or willing to do so. Yet she it is who sometimes accompanied Sophia on her irregular trips about the country.

Sophia is a minor, only 20 years old, and this is urged upon us as reason for refusing the adoption. This would be of importance if the adoption were to be based upon a consent but is not decisive when abandonment is the controlling fact. The grandparents of the child are interested in a sense. Yet they are not entitled to notice of the adoption proceedings: Adoption of Sensenderfer, 48 Lanc. 544, 546; and it is very doubtful whether they could be compelled under The Support Law of June 24, 1937, P. L. 2045, 62 PS

§1973 to support this illegitimate granddaughter: Commonwealth v. Clayton, 42 D. & C. 317.

These considerations are important because there is before us but one petition for adoption. None of the family of Sophia have presented any petition to this court, with or without Sophia's consent, asking that they be allowed the right of adoption, although at trial mention was made of this fact. Thus if the present petition be refused, Georgia Lee Lyskooka goes back to the custody of her mother. Sophia's family did not stand behind her before, how can we be sure they will again? At least they were never able to agree. Will they be able now to agree?

Evidence was presented by petitioners to show criminal conduct on the part of various members of the Lyskooka family. While we are satisfied Georgia Lee is much better off with the Stones, we have refrained from making any findings on this subject because these persons are not necessary parties to this proceeding and we have not been confronted with any definitive proposal on their part.

Entertaining these views we make the following

### Order

Now, September 27, 1945, the trial judge being satisfied that the statements made in the petition are true and that the welfare of Georgia Lee Lyskooka will be promoted by the adoption and that all the requirements of the act have been complied with and the facts having been found above, it is ordered, adjudged and decreed that Georgia Lee Lyskooka who was born in New Castle, Pa., on November 27, 1944, the daughter of Sophia Lyskooka, shall have all the rights of a child and heir of James L. Stone and Aileen W. Stone and be subject to the duties of such child, the costs to be paid by the petitioners. It is further ordered that this record be sealed as is provided by law.